**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MISSOURI**
**KANSAS CITY DIVISION**

| | |
|---|---|
| In Re<br><br>**Ziad H. Alsaoudi,**<br>Debtor.<br><br>**J.P. Morgan Mortgage Acquisition Corp.,**<br>Movant.<br><br>v.<br><br>**Ziad H. Alsaoudi,**<br>Debtor,<br><br>**Naysa Al-Saoudi,**<br>Co-Debtor. | **Case No. 10-44521-drd11**<br><br>**Chapter 11**<br><br>**MOTION FOR RELIEF FROM THE AUTOMATIC STAY**<br><br>**MOTION WAIVES 30 DAY HEARING**<br><br>**Kozeny & McCubbin, LC**<br>**12400 Olive Blvd., Suite 555**<br>**St. Louis, MO 63141**<br>**wdmo@km-law.com** |

**MOTION FOR RELIEF FROM AUTOMATIC STAY AND FROM THE CO-DEBTOR STAY (REAL PROPERTY)**

**COUNT I**
**(MOTION FOR RELIEF FROM THE AUTOMATIC STAY)**

J.P. Morgan Mortgage Acquisition Corp. (“Movant”) hereby moves this Court, pursuant to 11 U.S.C. § 362, for relief from the automatic stay with respect to certain real property of the Debtor having an address of 1310 N.W. 47th Street, Kansas City, MO 64116 (the “Property”). In further support of this Motion, Movant respectfully states:

1. A petition under Chapter 11 of the United States Bankruptcy Code was filed with respect to the Debtor on August 24, 2010. The Court has jurisdiction over this matter pursuant to 28 U.S.C. Sections 151, 157 and 1334 and the Automatic Reference

*KM11014526KM*

Order of the United States District Court for the Western District of Missouri dated August 15, 1984. This is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2). Venue is proper in this District under 28 U.S.C. Section 1409(a).

2. A Chapter 11 Plan was confirmed on July 13, 2011.

3. The Debtor, Ziad Al-Saoudi, has executed and delivered that certain promissory note in the original amount of $454,750.00 (the "Note"). A copy of the note is attached hereto as Exhibit 1. Movant is an entity entitled to enforce the Note.

4. Pursuant to that certain Deed of Trust (the "Deed of Trust"), all obligations (collectively, the "Obligations") of the Debtor and Co-Debtor, Nayda Al-Saoudi, under the Note and Deed of Trust with respect to the Loan are secured by the Property. A copy of the Deed of Trust is attached hereto as Exhibit 2.

5. The legal description of the Property is set forth in the Deed of Trust, a copy of which is attached hereto, and such description is incorporated and made a part hereof by reference.

6. As of May 16, 2017, the outstanding Obligations are:

| | |
|---|---:|
| Unpaid Principal Balance | $380,371.75 |
| Unpaid, Accrued Interest | $3,934.53 |
| Uncollected Late Charges | $1,999.34 |
| Mortgage Insurance Premiums | $0.00 |
| Taxes and Insurance Payments on behalf of Debtor(s) | $0.00 |
| Other Costs | $3,169.48 |
| **Less**: Partial Payments | ($0.00) |
| Minimum Outstanding Obligations | $389,475.10 |

7. In addition to the other amounts due to Movant reflected in this Motion, as

of the date hereof, in connection with seeking the relief requested in this Motion, Movant has also incurred $850.00 in legal fees and $181.00 in costs. Movant reserves all rights to seek an award of allowance of such fees and expenses in accordance with applicable loan documents and related agreements, the Bankruptcy Code and other applicable law.

8. The following chart sets forth the number and amount of post-petition payments due pursuant to the terms of the Note that have been missed by the Debtor as of May 16, 2017:

| Number of Payments | From | To | Monthly Payment Amount | Total Amounts Delinquent |
|---|---|---|---|---|
| 1 | 03/01/2017 | 03/01/2017 | $2,685.57 | $2,685.57 |
| 1 | 04/01/2017 | 04/01/2017 | $2,734.84 | $2,734.84 |
| 1 | 05/01/2017 | 05/01/2017 | $2,687.65 | $2,687.65 |
| | | | Less post-petition partial payments: | ($0.00) |
| | | | Total: | $8,108.06 |

9. The fair market value of the Property is $450,000.00. The basis for such valuation is Schedule A of the Debtor`s Schedules. A copy of Schedule A is attached hereto as Exhibit 3.

10. Upon information and belief, the aggregate amount of encumbrances on the Property listed in the Schedules or otherwise known, including but not limited to the encumbrances granted to the Movant, is $470,188.36.

11. Cause exists for relief from the automatic stay for the following reasons:

(a) Movant`s interest in the Property is not adequately protected.

**WHEREFORE**, Movant prays that this court issue an Order terminating or

modifying the stay and granting the following:

1. Relief from the stay allowing Movant (and any successors or assigns) to proceed under applicable non-bankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property.

2. That the Order be binding and effective despite any conversion of the bankruptcy case to a case under any other chapter of Title 11 of the United States Code.

3. That the 14-day stay described by Bankruptcy Rule 4001(a)(3) be waived.

4. For such other relief as the Court deems proper.

**COUNT II**

**(MOTION FOR RELIEF FROM CO-DEBTOR STAY)**

**COMES NOW** J.P. Morgan Mortgage Acquisition Corp. and its principals Successors and Assigns, and for Count II of its motion, requests relief from the Co-Debtor Stay as to Nayda Al-Saoudi, ("Co-Debtor") and in support thereof alleges as follows:

1. Movant restates and re-alleges all of the allegations contained in Count I and incorporates them herein by this reference.

2. The following chart sets forth the number and amount of postpetition payments due pursuant to the terms of the Note that have been missed by the Co-Debtor as of May 16, 2017:

| Number of Payments | From | To | Monthly Payment Amount | Total Amounts Delinquent |
|---|---|---|---|---|
| 1 | 03/01/2017 | 03/01/2017 | $2,685.57 | $2,685.57 |
| 1 | 04/01/2017 | 04/01/2017 | $2,734.84 | $2,734.84 |
| 1 | 05/01/2017 | 05/01/2017 | $2,687.65 | $2,687.65 |
| | | | Less post-petition partial payments: | ($0.00) |
| | | | Total: | $8,108.06 |

3. Pursuant to 11 U.S.C. § 1301(c)(2) and (3), on request of a party in interest and after notice and hearing, the Court shall grant relief from the Co-Debtor stay with respect to a creditor, to the extent that the plan filed by the Debtor proposes not to pay such claim; or such creditor`s interest would be irreparably harmed by continuation of such stay.

4. Movant asserts that Movant will incur irreparable harm by continuation of the Co-Debtor stay imposed by 11 U.S.C. § 1301, in that the loan is post-petition delinquent. As such, grounds exist for granting relief from the Co-Debtor stay as to Nayda Al-Saoudi, effective immediately upon entry of the Order.

**WHEREFORE**, J.P. Morgan Mortgage Acquisition Corp. respectfully prays this Court:

Enter an Order granting relief from the automatic stay, finding that the fourteen (14) day stay period pursuant to Rule 4001(a)(3) shall be inapplicable; authorizing Movant to exercise its rights under the Note and Deed of Trust and applicable non-bankruptcy laws; authorizing Movant to pursue its state court remedies for possession of the subject real estate; authorizing Movant to at its option, offer, provide and enter into any potential forbearance agreement, loan modification, refinance agreement or

other loan workout/loss mitigation agreement; authorizing Movant to contact the Debtor

via telephone or written correspondence to offer such an agreement, which shall be

non-recourse unless included in a reaffirmation agreement; and for such other orders as

the Court deems appropriate.


Respectfully submitted,

/s/H. Joseph Esry
Jonathon B. Burford, #59337
H. Joseph Esry, #66708
Attorneys for Movant
12400 Olive Blvd., Suite 555
St. Louis, MO 63141
Phone: (314) 991-0255
Fax:  (314) 567-8019
wdmo@km-law.com


I certify that a true copy of the Above Pleading was served either electronically or via
first class mail on June 7, 2017, upon the following parties:

Ziad H. Alsaoudi
Debtor
1310 N.W. 47th Street
Kansas City, MO 64116

Nayda Al-Saoudi
Co-Debtor
1310 N.W. 47th Street
Kansas City, MO 64116

Bruce E. Strauss
Victor F. Weber
Attorneys for Debtor
1044 Main St, Suite 500
Kansas City, MO 64105


*KM11014526KM*

Office of the U.S. Trustee
U.S. Trustee
400 East 9th Street Room 3440
Kansas City, MO 64106-1910

Advance Restaurant Finance
Creditor
c/o Pamela Palmer
103 W 26th Ave Ste 216
Kansas City, MO 64116

AmTrust Bank
Creditor
1801 E. 9th St.
Cleveland, OH 44114-3107

Capitol Financial Group, LLC
Creditor
7606 Forsyth Blvd.
St. Louis, MO 63105

Everardo and Elsa Suarez
Creditor
c/o Henri Watson
2500 Holmes
Kansas City, MO 64108

Household Finance Corp
Creditor
1421 Kristina Way
Chesapeake, VA 23320-8917

Lorene Johnson
Creditor
c/o Ronald Weiss
2230 Commerce Tower
911 Main
Kansas City, MO 64105

/s/ Christina Buck
    Christina Buck

*KM11014526KM*

Loan Number [redacted]

# ADJUSTABLE RATE NOTE
## (1 Year Treasury Index–Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| FEBRUARY 28, 2002 | OVERLAND PARK | KANSAS |
|---|---|---|
| [Date] | [City] | [State] |

1310 N.W. 47TH STREET, KANSAS CITY, MISSOURI 64116
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 454,750.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is MORTGAGE PLUS, INC., A KANSAS CORPORATION . I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.125 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on APRIL 1, 2002 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MARCH 1, 2032 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 6750 W. 93RD ST. SUITE 130, OVERLAND PARK, 66212 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 3,376.51 . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the 1st day of MARCH, 2005 , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 000/1000 percentage points ( 5.000 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.125 % or less than 6.125 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO AND 000/1000 percentage points ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 14.125 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY** ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial

Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

MULTISTATE ADJUSTABLE RATE NOTE--ARM 5-2--Single Family
Fannie Mae/Freddie Mac MODIFIED INSTRUMENT
FANNIE MAE ARM 4-2/5-2/6-2 Page 3 of 4 Form 3502 1/01
DocMagic eForms 800-649-1362
www.docmagic.com

US35023.NOT

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_________________ (Seal)
ZIAD AL-SAOUDI -Borrower

_________________ (Seal)
-Borrower

_________________ (Seal)
-Borrower

_________________ (Seal)
-Borrower

_________________ (Seal)
-Borrower

_________________ (Seal)
-Borrower

*[Sign Original Only]*

*Loan Number* [redacted]

# OHIO ON-TIME PROGRAM ADDENDUM TO ADJUSTABLE RATE NOTE

THIS OHIO ON-TIME PROGRAM ADDENDUM TO ADJUSTABLE RATE NOTE (the "Addendum") is made this *28th* day of *FEBRUARY, 2002* , and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note made by the undersigned (the "Borrower"), in favor of *MORTGAGE PLUS, INC.* (the "Lender") and dated the same date as this Addendum (the "Note"). The Note is secured by the Security Instrument, as modified or amended, in favor of Lender and dated the same date as this Addendum (the "Security Instrument").

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

1. **OHIO ON-TIME PROGRAM MARGIN PERCENTAGE REDUCTION**
   As set forth in Section 4 of the Note, Borrower has agreed to future interest rate and monthly payment amount changes. Prior to each Change Date, changes in the rate of interest Borrower agrees to pay are determined by adding a specified percentage (the "Margin") to the Current Index, and rounding the calculation to the nearest one-eighth of one percentage point (the "Note Rate").

   1.1 If borrower has a 1 to 1 or 2 to 1 Adjustable Rate Mortgage (ARM) Loan, and if on either the second, third or fourth anniversary of the date of the Note (each being an "Anniversary Date") Borrower has demonstrated a Good Payment History, as defined below, Lender will decrease the Margin on the Note by one (1.00) percentage point and the Note Rate will be adjusted pursuant to Section 4 of the Note using the Current Index. The new Margin and Rate will take effect on the earliest Anniversary Date on which Borrower has demonstrated a Good Payment History ("Margin Reduction Date"). The new Margin will be used in determining all future interest rates and monthly payment amounts. Beginning with Borrower's first monthly payment after the Margin Reduction Date. Borrower will pay the new monthly payment amount until the next scheduled Change Date where upon the Note Rate and payment amount will be adjusted as set forth in Section 4 of the Note.

   1.2 If borrower has a 3 to 1 Adjustable Rate Mortgage (ARM) Loan, and if on either the second, third or fourth anniversary of the date of the Note (each being an "Anniversary Date") Borrower has demonstrated a Good Payment History, as defined below. Lender will decrease the Margin on the Note by one (1.00) percentage point. The new Margin and Rate will take effect on the earliest Anniversary Date on which Borrower has demonstrated a Good Payment History ("Margin Reduction Date"). If the Margin Reduction Date occurs on the second Anniversary Date, the Note Rate and Monthly Payment will be reduced effective as of the Margin Reduction Date. The new Margin will be used in determining all future interest rates and monthly payment amounts. Beginning with Borrower's first monthly payment after the Margin Reduction Date, Borrower will pay the new amount as the monthly payment until the next scheduled Change Date as set forth in Section 4 of the Note. If the Margin Reduction Date occurs on the third or fourth Anniversary Date, the Note Rate will be adjusted using the new Margin and the Current Index, pursuant to Section 4 of the Note. In any event, Borrower will pay the new monthly payment amount until the next scheduled Change Date where upon the Note Rate and payment amount will be adjusted as set forth in Section 4 of the Note.

DocMagic eForms 800-649-1362
www.docmagic.com

**2. GENERAL TERMS**

The following provisions apply to 1 to 1; 2 to 1; and 3 to 1 ARM Loans in connection with the OHIO On-Time Program.

2.1 Borrower will be deemed to have demonstrated a "Good Payment History" at an Anniversary Date if Borrower:

(a) has made each of the then most recent 24 consecutive monthly payments, prior to such Anniversary Date, in accordance with the Note and Security Instrument before the date the next payment was due; and

(b) has never made a payment more than 90 days after the date it was due under the Note.

2.2 If Borrower has a Good Payment History as of the second, third or fourth Anniversary Date, Lender will notify Borrower in writing that the Margin will be decreased. Lender will decrease Borrower's Margin only one time during the term of the loan. Notwithstanding anything to the contrary contained herein, all adjustments to the Note Rate at each Interest Change Date are subject to the limits set forth in Section 4(D) of the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this OHIO On-Time Program Addendum to Adjustable Rate Note.

_______________ (Seal)
ZIAD AL-SAOUDI -Borrower

_______________ (Seal)
NAYDA AL-SAOUDI -Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

DocMagic eForms 800-649-1362
www.docmagic.com

# Allonge to Promissory Note

Without recourse pay to the order of:

Ohio Savings Bank

By: [signature]

Name: Todd D. Geiman
Title: President

Company: Mortgage Plus, Inc.

Cleveland, Ohio ______ 20 __
PAY TO THE ORDER OF
______
Without Recourse
AmTrust Bank
FKA Ohio Savings Bank
BY: [signature]
Gary Brenner
Authorized Agent

Loan Information:
Borrower: Ziad Al-Saoudi

Address: 1310 N.W. 47th Street
Kansas City, MO 64166

Loan Amount: $ #454,750.00

Loan Date: February 28, 2002

R00435

MAR 07 2002

STATE OF MO.
CLAY COUNTY
I CERTIFY INSTR. REC'D
02 MAR -7 P 1:02
BOOK#3570 PAGE#518
ROBERT T. SEVIER
RECORDER OF DEEDS
By Debra Blay Deputy

BOOK 3570 PAGE 518

*(Space above reserved for Recorder of Deeds certification)*

Loan Number [redacted]

**Title of Document:** DEED OF TRUST

**Date of Document:** FEBRUARY 28, 2002

**Grantor(s):** ZIAD AL-SAOUDI AND NAYDA AL-SAOUDI HUSBAND AND WIFE AS JOINT TENANTS

**Grantor(s) Mailing Address:** 1310 N.W. 47TH STREET, KANSAS CITY, MISSOURI 64166

**Grantee(s):** MORTGAGE PLUS, INC.

**Grantee(s) Mailing Address:** 6750 W. 93RD ST. SUITE 130, OVERLAND PARK, KANSAS, 66212

**Legal Description:** LOT 76, BRIARCLIFF WEST 3RD PLAT, A SUBDIVISION IN KANSAS CITY, CLAY COUNTY, MISSOURI, ACCORDING TO THE RECORDED PLAT THEREOF.

**Reference Book and Page(s):**

*(If there is not sufficient space on this page for the information required, state the page reference where it is contained within the document.)*

BOOK 3570 PAGE 519

After Recording Return To:
MORTGAGE PLUS, INC.
6750 W. 93RD ST. SUITE 130
OVERLAND PARK, KANSAS 66212
Loan Number: [redacted]

[Space Above This Line For Recording Data]

# DEED OF TRUST

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated FEBRUARY 28, 2002, together with all Riders to this document.

**(B)** "**Borrower**" is ZIAD AL-SAOUDI AND NAYDA AL-SAOUDI HUSBAND AND WIFE AS JOINT TENANTS

Borrower is the trustor under this Security Instrument.

**(C)** "**Lender**" is MORTGAGE PLUS, INC.

Lender is a CORPORATION organized and existing under the laws of KANSAS. Lender's address is 6750 W. 93RD ST. SUITE 130, OVERLAND PARK, KANSAS 66212.

Lender is the beneficiary under this Security Instrument.

**(D)** "**Trustee**" is ~~NATIONS TITLE AGENCY, 9401 NALL, OVERLAND PARK, KANSAS 66207~~ ANTHONTY A. STEIN

**(E)** "**Note**" means the promissory note signed by Borrower and dated FEBRUARY 28, 2002. The Note states that Borrower owes Lender FOUR HUNDRED FIFTY FOUR THOUSAND SEVEN HUNDRED FIFTY AND 00/100 Dollars (U.S. $ 454,750.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MARCH 1, 2032.

**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

Legal description of the property is set forth on page 2 of this Security Instrument.

**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

BOOK 3570 PAGE 520

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, bargains, sells, conveys and confirms to Trustee, in trust, with power of sale, the following described property located in the

COUNTY of JACKSON :

[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

LOT 76, BRIARCLIFF WEST 3RD PLAT, A SUBDIVISION IN KANSAS CITY, CLAY COUNTY, MISSOURI, ACCORDING TO THE RECORDED PLAT THEREOF.

DocMagic eForms 800-649-1362
www.docmagic.com

MO30262.DOT

which currently has the address of 1310 N.W. 47TH STREET
[Street]
KANSAS CITY , Missouri 64166 ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BOOK 3570 PAGE 521

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

BOOK 3570 PAGE 522

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only

so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

BOOK 3570 PAGE 523

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

BOOK 3570 PAGE 524

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

BOOK 3570 PAGE 525

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable

BOOK 3570 PAGE 526

Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

BOOK 3570 PAGE 527

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa, and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

ZA N.A

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

BOOK 3570 PAGE 528

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

BOOK 3570 PAGE 529

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender or Trustee shall mail copies of a notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property to any later time on the same date by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument

N. A

is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Lease of the Property.** Trustee hereby leases the Property to Borrower until this Security Instrument is either satisfied and released or until there is a default under the provisions of this Security Instrument. The Property is leased upon the following terms and conditions: Borrower, and every person claiming an interest in or possessing the Property or any part thereof, shall pay rent during the term of the lease in the amount of one cent per month, payable on demand, and without notice or demand shall and will surrender peaceable possession of the Property to Trustee upon default or to the purchaser of the Property at the foreclosure sale.

**26. Homestead Exemption.** Borrower hereby waives all homestead exemptions in the Property to which Borrowers would otherwise be entitled under Applicable Law.

**27. Notice. Oral agreements or commitments to loan money, extend credit or to forebear from enforcing repayment of debt including promises to extend or renew such debt are not enforceable. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

BOOK 3570 PAGE 530

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_______________ (Seal)
ZIAD AL-SAOUDI -Borrower

_______________ (Seal)
NAYDA AL-SAOUDI -Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

Witness:

_______________

Witness:

_______________

DocMagic eForms 800-649-1362
www.docmagic.com

State of ~~Missouri~~ Kansas
County (and/or City) of JOHNSON

On this 28th day of February, 2002, before me personally appeared ZIAD AL-SAOUDI, NAYDA AL-SAOUDI, husband and wife,

to me known to be the person (or persons) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

BOOK 3570 PAGE 531

Wanda Carol French
Notary Public

(Seal)

My Commission Expires: NOTARY PUBLIC STATE OF KANSAS Wanda Carol French My Appt. Exp. 4/27/2002

ZA N.A

Main Document Page 29 of 37

AFTER RECORDING, RETURN TO:

AmTrust Bank
Attn: C. FitzGibbon
OH98-0812
1111 Chester Avenue
Cleveland OH 44114
Loa[redacted]

MIN

# ADJUSTABLE RATE LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement"), made this 12th day of June 2008, between Ziad Al-Saoudi and Nayda Al-Saoudi, Husband and Wife as Joint Tenants ("Borrower") and AmTrust Bank, Formerly known as Ohio Savings Bank ("Lender") and Mortgage Electronic Registration Systems, Inc., ("Mortgagee"), amends and supplements one certain promissory note ("Note") dated February 28, 2002, in the original principal amount of $454,750.00 executed by Ziad Al-Saoudi and Nayda Al-Saoudi, Husband and Wife as Joint Tenants ("Maker") payable to the order of AmTrust Bank, in accordance with the terms set forth herein and granted or assigned to Mortgage Electronic Registration Systems, Inc., as Mortgagee of record (solely as nominee for Lender and Lender's successors and assigns), P.O. Box 2026, Flint, Michigan 48501-2026. Borrower acknowledges that Lender is the holder and the owner of the Note and understands that Lender may transfer the Note, as amended by this Agreement, and that anyone who takes the Note by transfer and who is entitled to receive payments under the Note is called the "Lender" in this Agreement. The Note is secured by a Contract for Labor and Materials, Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated February 28, 2002, and filed for record on March 7, 2002, under Document # R00435, Book # 3570, Page # 518 of the official records of Clay County, Missouri. Said Security Instrument conveys the real and personal property described in such Security Instrument (the "Property") located at:

1310 NW 47th Street, Kansas City, Missouri 64166
(Property Address)

the real property described being set forth as follows:

LOT 76, BRIARCLIFF WEST 3RD PLAT, A SUBDIVISION IN KANSAS CITY, CLAY COUNTY, MISSOURI, ACCORDING TO THE RECORDED PLAT THEREOF.

(Legal Description)

Borrower now desires to extend or rearrange the time and manner of (re)payment of the Note and to extend and carry forward the lien(s) on the Property whether created by the Security Instrument or otherwise. Lender, the legal holder and owner of the Note and of the lien(s) securing the same has agreed at the request of the Borrower to extend or rearrange the time and manner of payment of the Note.

For and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid by each of the parties to the other, the receipt and sufficiency of which are hereby acknowledged and confessed, and in consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

MERS Phone: 1-888-679-6377

Loan Modification Agreement—Single Family—Fannie Mae Uniform Instrument MERS Modified Form 3179 1/01 (rev. 8/01)[redacted]
—The Compliance Source, Inc.— Page 1 of 8
www.compliancesource.com ©2004 The Compliance Source, Inc.
BARCODE

1. Acknowledgment of Unpaid Principal Balance: Borrower acknowledges that as of June 1, 2008, the amount payable under the Note and secured by the Security Instrument (the "Unpaid Principal Balance") is U.S. $432,629.79. Borrower hereby renews and extends such indebtedness and promises to pay jointly and severally to the order of Lender the sum of U.S. $473,866.82 (the "Principal Balance"), consisting of the amount(s) loaned to Borrower by Lender plus any accrued but unpaid interest and advances for taxes and/or insurance capitalized to date.

2. Repayment Terms: Interest will be charged on the unpaid Principal Balance until the full amount of principal has been paid. Borrower will pay interest at a yearly rate of 8.000% from June 1, 2008. The interest rate Borrower will pay will change in accordance with Paragraphs 6 and 7 of this Agreement. The interest rate required by this Paragraph 2 and Paragraphs 6 and 7 of this Agreement is the rate Borrower will pay both before and after any default under the terms of the Note, as amended by this Agreement.

3. Time and Place of Payments: Borrower promises to make initial monthly principal and interest payments of U.S. $3,477.07, beginning on July 1, 2008, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. If on June 1, 2038 ("Modified Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 1111 Chester Ave Suite 200, Cleveland OH 44114, or at such other place as Lender may require.

4. Payment Changes: Changes in the monthly payment will reflect changes in the unpaid principal of the loan and in the interest rate Borrower must pay. Lender will determine the new interest rate and the changed amount of the monthly payment in accordance with Paragraphs 6 and 7 of this Agreement. The interest rate Borrower will pay may change on March 1, 2009, and on that day every 12th month thereafter. Each date on which the interest rate could change is called a "Change Date".

5. The Index: Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index." If the Index is no longer available, the Lender will choose a new index which is based upon comparable information. Lender will give Borrower notice of this choice.

6. Calculation of Changes: Before each Change Date, Lender will calculate the new interest rate by adding 2.75% to the Current Index. Lender will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated below, this rounded amount will be the new interest rate until the next Change Date. Lender will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that Borrower is expected to owe at the Change Date in full on the maturity date at the new interest rate in substantially equal payments. The result of this calculation will be the new amount of the monthly payment. Borrower will pay the amount of the new monthly payment beginning on the first monthly payment date after the Change Date until the amount of the monthly payment changes again. The monthly payments will be applied first to the payment of interest due and then to principal.

©2004, The Compliance Source, Inc

BARCODE

7. Interest Rate Limitations [*check applicable box*]:

☒ The interest rate Borrower is required to pay at the first Change Date will not be greater than 10.125% or less than 6.125%. Thereafter, the interest rate will never be increased or decreased on any single Change Date by more than 2.0% from the rate of interest Borrower has been paying for the preceding 12 months. The interest rate will never be greater than 14.125%.

☐ At each Change Date, the interest rate Borrower is required to pay cannot increase beyond the lifetime interest rate cap of %. This capped rate may be reached on the first Change Date. The interest rate Borrower is required to pay may never increase above the lifetime interest rate cap or decrease below the margin.

8. Notice of Changes: Before the effective date of any change, Lender will deliver or mail to Borrower notice of any changes in the interest rate and the amount of the monthly payment. The notice will include information required by law to be given to Borrower and also the title and telephone number of a person who will answer any questions Borrower may have. Unless applicable law requires a different method, any notice that must be given to Borrower under this Agreement will be given by delivering it or mailing it by first class mail to Borrower at the Property Address stated above or at a different address if Borrower gives Lender notice of Borrower's different address. Any notice that must be given to Lender under this Agreement will be given by mailing it first class mail to the Lender at the address stated in Paragraph 3 above or at a different address if Borrower is given notice of that different address.

9. Late Charges for Overdue Payments: If Lender has not received the full amount of any monthly payment by the end of 16 calendar days after the date it is due, Borrower will pay a late charge to Lender. The amount of the charge will be 5.0% of the overdue payment of principal and interest. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy, and will not be charged if such charge would constitute interest in excess of the maximum permitted by state law.

10. Borrower's Right to Prepay: Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When Borrower makes a prepayment, Borrower will notify Lender in writing that Borrower is doing so.

11. Renewal and Extension of Maturity: The lien security interest secured by this Agreement is a renewal and extension effective as of June 1, 2008. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended until the Principal Balance evidenced by the Note, as renewed, modified, and extended hereby, has been fully paid. Lender and Borrower acknowledge and agree that such extension, renewal, amendment, modification, or rearrangement shall in no manner affect or impair the Note or the liens and security interests securing same, the purpose of this Agreement being simply to extend, modify, amend or rearrange the time and the manner of payment of the Note and the indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note (including if applicable any and all vendor's liens securing the Note), which are expressly acknowledged by Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note. Borrower hereby expressly waives the benefit of any and all statutes of limitation which might otherwise inure to Borrower's benefit, or be in any way applicable to Borrower's obligations under the terms of any and all instruments described herein.

12. Transfer of the Property or a Beneficial Interest in Borrower: If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option,

Main Document Page 32 of 37

require immediate payment in full of all sums secured by the Security Instrument. If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

13. Usury: No provisions of this Agreement or the Note or any instrument evidencing or securing the Note, or otherwise relating to the indebtedness evidenced by the Note, shall require the payment or permit the demand, collection, application or receipt of interest in excess of the maximum permitted by applicable state or federal law. If any excess of interest in such respect is herein or in any such other instrument provided for, or shall be adjudicated to be so provided for herein or in any such instrument, the provisions of this Paragraph shall govern, and neither Borrower nor any endorser or guarantor of the Note nor their respective heirs, personal representatives, successors or assigns shall be obligated to pay the amount of such interest to the extent it is in excess of the amount permitted by applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender to at all times comply with the usury and other laws relating to the Note and the Security Instrument and any subsequent revisions, repeals or judicial interpretations hereof, to the extent applicable thereto. In the event Lender ever receives, collects or applies as interest any such excess, including but not limited to any "late charges" collected, such amount which would be excessive interest shall be applied to the reduction of the Unpaid Principal Balance of the Note, and, if upon such application the principal balance of the Note is paid in full, any remaining excess shall be paid to Borrower and the provisions of the Note and the Security Instrument shall immediately be deemed reformed and the amounts thereafter collectible there under reduced, without the necessity of execution of any new document, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for there under. In determining whether or not the interest paid or payable under any specific contingency exceeds the maximum interest allowed to be charged by applicable law, Borrower and Lender shall, to the maximum extent permitted under applicable law, amortize, prorate, allocate and spread the total amount of interest throughout the entire term of the Note so that the amount or rate of interest charged for any and all periods of time during the term of the Note is to the greatest extent possible less than the maximum amount or rate of interest allowed to be charged by law during the relevant period of time.

MERS Phone: 1-888-679-6377
Loan Modification Agreement—Single Family—Fannie Mae Uniform Instrument MERS Modified Form 3179 1/01 (rev. 8/01)
—The Compliance Source, Inc.— Page 4 of 8 23702MU 05/04
www.compliancesource.com ©2004, The Compliance Source, Inc
BARCODE

Main Document Page 33 of 37

14. Release and Waiver of Other Claims: In consideration of the modification of certain provisions of the Note and Security Instrument, all as herein provided, and the other benefits received by Borrower hereunder, Borrower hereby RELEASES, RELINQUISHES, and forever DISCHARGES Lender, as well as its predecessors, successors, assigns, agents, officers, directors, employees and representatives, of and from any and all claims, demands, actions and causes of action of any and every kind of character, whether known or unknown, present or future, which Borrower may have against Lender, and its predecessors, successors, assigns, agents, officers, directors, employees and representatives, arising out of or with respect to any and all transactions relating to the Note and the Security Instrument occurring prior to the date hereof, including any loss, cost or damage, of any kind or character, arising out of or in any way connected with or in any way resulting from the acts, actions or omissions of Lender, and its predecessors, successors, assigns, agents, officers, directors, employees, and representatives, including any breach of fiduciary duty, breach of any duty of fair dealing, breach of confidence, breach of funding commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violations of the Racketeer Influenced and Corrupt Organizations Act, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate governance or prospective business advantage, breach of contract, deceptive trade practices, libel, slander, conspiracy or any claim for wrongfully accelerating the Note or wrongfully attempting to foreclose on any collateral relating to the Note, but in each case only to the extent permitted by the applicable law, of this state.

15. Loan Documentation: As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, and Borrower acknowledges and reaffirms Borrower's liability to Lender thereunder. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instruments, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement. Any default by Borrower in the Security Instrument, shall allow Lender to exercise all of its remedies set forth in said Security Instrument.

16. Partial Invalidity: In the event any portion of the sums intended to be secured by this Agreement cannot be lawfully secured, payments in reduction of such sums shall be applied first to those portions not secured.

17. Co-Signer Liability: Any co-signer who signs this Agreement but has not executed the Note is co-signing this Agreement only to mortgage, grant and convey that co-signer's interest in the Property under the terms of this Agreement. Co-signer is not personally obligated to pay the sums secured by the Security Instrument, and agrees that Lender and Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of the Note or the Security Instrument, without co-signer's consent.

18. Hazardous Substances: Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property. Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or

MERS Phone: 1-888-679-6377
Loan Modification Agreement—Single Family—Fannie Mae Uniform Instrument
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 5 of 8
MERS Modified Form 3179 1/01 (rev. 8/01)
23702MU 05/04
©2004, The Compliance Source, Inc
BARCODE

regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. As used in this Paragraph 18, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this Paragraph 18, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

19. Miscellaneous: Borrower hereby agrees to pay all costs and expenses incurred by Lender in connection with the execution and administration of this Agreement, the renewal and extension and modification of the Note and Security Instrument, and any other documents executed in connection herewith.

    Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party hereto.

    This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Agreement.

20. NO ORAL AGREEMENTS: THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

    THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*[Signatures on Following Page]*

EXECUTED as of the day and year first above written.

Ziad Al-Saoudi -Borrower

-Borrower

-Borrower

-Borrower

ACCEPTED AND AGREED TO BY THE OWNER AND HOLDER OF SAID NOTE

©2004, The Compliance Source, Inc

BARCODE

Main Document Page 35 of 37

By: ______________________________
-Lender

Mortgage Electronic Registration Systems, Inc.

By: ______________________________
-Mortgagee

*[Acknowledgments on Following Page]*

MERS Phone: 1-888-679-6377
Loan Modification Agreement—Single Family—Fannie Mae Uniform Instrument
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 7 of 8
MERS Modified Form 3179 1/01 (rev. 8/01)
23702MU 05/04
©2004 The Compliance Source, Inc.
BARCODE

INDIVIDUAL ACKNOWLEDGMENT

VICKIE MERSMAN
Notary Public - Notary Seal
STATE OF MISSOURI
JACKSON COUNTY
MY COMMISSION EXPIRES JULY 9, 2010
Commission # 06910745

State of §
§
County of §

This instrument was acknowledged before me on

by Vickie Mersman

Vickie Mersman
Notary Public

CORPORATE ACKNOWLEDGMENT

| State of | | § |
|---|---|---|
| | | § |
| County of | | § |

The foregoing instrument was acknowledged before me on *[date]*, by *[name of officer or agent, title of officer or agent]* of *[name of corporation acknowledging]*, *[state or place of incorporation]*, on behalf of the corporation.

(Seal)

Notary Public, State of

My Commission Expires:

**B6A (Official Form 6A) (12/07)**

In re **Ziad H. Alsaoudi**, Debtor

Case No. ____________

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim." If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| **Residence located 1310 Northwest 47th Street, Kansas City, Missouri 64116** | | **-** | **450,000.00** | **Unknown** |
| **Real property commonly known as 1650 N Universal, Kansas City, Missouri** | | **-** | **500,000.00** | **Unknown** |
| **2 Bedroom House in Amman, Jordan** | | **-** | **50,000.00** | **0.00** |

Sub-Total > **1,000,000.00** (Total of this page)

Total > **1,000,000.00**

(Report also on Summary of Schedules)

**0** continuation sheets attached to the Schedule of Real Property

Software Copyright (c) 1996-2010 - Best Case Solutions - Evanston, IL - www.bestcase.com Best Case Bankruptcy